**Rodney K. BLUEL, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**No. S–11564.**

Supreme Court of Alaska.

March 9, 2007.

William R. Satterberg, Jr., Fairbanks, for Petitioner.

Kenneth M. Rosenstein, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Respondent.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

BRYNER, Chief Justice.

# I. INTRODUCTION

After being arrested for driving while intoxicated, Rodney Bluel failed the mandatory breath test and then declined when asked if he wanted an optional blood test. At trial, after Bluel testified that he had been surprised by his failing score on the breath test, the state was allowed to impeach his claim of surprise by asking about his refusal to ask for the independent blood test. The issue here is whether evidence that Bluel declined the optional test amounted to an impermissible comment on the exercise of his right to refuse. Because Alaska's implied consent law gave Bluel the right to decline further testing and required the state to honor his choice, we conclude that evidence of his refusal created a danger of unfair prejudice greatly outweighing the refusal's impeachment value. We therefore hold that the refusal was inadmissible under Alaska Rule of Evidence 403.

# II. FACTS AND PROCEEDINGS

The relevant facts and proceedings at issue here are undisputed and were summarized as follows by the court of appeals:

At about 2:30 in the morning on November 17, 2001, an Alaska state trooper stopped Bluel for a traffic violation on Badger Road in Fairbanks. Upon contact, the trooper noticed indications that Bluel was intoxicated. The trooper administered field sobriety tests, which Bluel failed. Bluel was then arrested for driving while intoxicated. He was later tested on a DataMaster, which showed that his blood alcohol content was 0.091 percent.

After the breath test, the trooper advised Bluel that he had the right to an independent chemical test. Bluel declined.

Before trial, Bluel filed a motion requesting that the district court preclude "any discussion of whether or not a blood test was offered[.]" In his motion, Bluel argued that any evidence that he had declined to get an independent test was more prejudicial than probative. He also claimed that the State should not be allowed to comment on his exercise of a constitutional right. The State opposed Bluel's motion, arguing that it should not be foreclosed from introducing evidence that Bluel refused an independent test if the evidence became relevant at trial.

District Court Judge Raymond M. Funk granted Bluel's motion, construing it as a request for a protective order. Judge Funk's pre-trial order prevented the State from introducing evidence in its case-in-chief that Bluel had been offered an independent test, unless the State showed that the evidence was relevant and more probative than prejudicial.

The trial was conducted before Judge Crutchfield. In accordance with Judge Funk's order, the State did not, during its case-in-chief, introduce any evidence that Bluel had been offered a second test. But during the defense case, Bluel testified. He told the jury that he had consumed only one full drink earlier that evening, and a small portion of another drink just before he drove. He claimed that, in light of the small amount of alcohol he had consumed, he had been surprised that the DataMaster result was so high. Over Bluel's objection, the State was then allowed to impeach Bluel by showing that he had been given a chance to take an independent test but had declined. [1]

After the jury found Bluel guilty of driving while intoxicated (DWI), Bluel appealed to the court of appeals. On appeal, he challenged the admission of his testimony concerning his refusal of an independent test, asserting that the evidence should have been excluded both as a matter of discretion—because its prejudicial impact outweighed its probative value—and because it violated his constitutional rights, including his privilege against self-incrimination, his right to a *Miranda* warning, and his right to be protected against unreasonable searches and seizures. In an unpublished opinion, the court of appeals found no abuse of discretion in the trial court's determination that Bluel's refusal was

---

1. *Bluel v. State*, 2004 WL 1418697, at *1 (Alaska App. June 23, 2004).

more probative than prejudicial.[2] The opinion upheld admission of the disputed evidence on this basis, expressly declining to consider Bluel's constitutional claims because they were inadequately briefed.[3]

We granted Bluel's petition for hearing, specifically requesting the parties to brief "whether [Bluel] had a statutory right to refuse a blood test and, if so, whether the right was impermissibly undercut by allowing evidence of his refusal."

## III. DISCUSSION

### A. Parties' Arguments

In challenging the decision of the court of appeals, Bluel renews his claims that evidence disclosing that he declined independent testing should have been excluded. He asserts that the trial court erred by admitting the evidence and violated the Alaska Rules of Evidence because the prejudicial impact of his refusal outweighed any probative value it might have had. Bluel also insists that evidence of his refusal was inadmissible as a matter of law because it impermissibly commented on and undercut his exercise of various constitutional and statutory rights—including his privilege against self-incrimination, his right to a *Miranda* warning, his right to be protected against unreasonable searches and seizures, and his right to refuse further testing after consenting to a breath test.

While recognizing that Bluel "had a right to an independent test and was free to waive that right," the state asserts that "it would be a misnomer to view his ability to waive as a right itself." And even if his ability to waive is viewed as a right, the state contends, "evidence of his waiver did not undercut that 'right.'" Instead, the state insists that the disputed evidence became admissible to impeach Bluel once he testified that he had been surprised at learning the result of his breath test. In the state's view, then, "any chilling effect was the sole product of Bluel's own tactical decisions," namely, "his

effort to mislead the jury" by testifying as to his surprise.

With respect to Bluel's constitutional claims, the state asserts that we should decline to reach those claims because they have not been adequately briefed. Relying on the court of appeals' ruling that Bluel's briefing "offer[ed] little more than conclusory assertions that his rights were violated,"[4] the state notes that his current briefing is "essentially the same as that which the court of appeals rejected." Since Bluel's opening brief before this court fails to challenge the court of appeals' finding of inadequacy, the state reasons that "[t]his court, like the court of appeals, should refuse to consider Bluel's arguments."

Nevertheless, "[i]n an abundance of caution," the state also addresses Bluel's constitutional claims on their merits. It contends that asking Bluel whether he wanted an independent test did not amount to a custodial interrogation that could have triggered the *Miranda* rule. In addition, the state contends that the constitutional protection against self-incrimination did not apply to Bluel's refusal, even though it was a testimonial communication, because the refusal was not incriminatory when Bluel communicated it to the police. The state further contends that, because "the exclusive purpose of the independent test is to provide a defendant with the means to challenge the reliability of the mandatory chemical test," Bluel's decision to avoid additional testing cannot be likened to an exercise of his right to refuse an unreasonable search. While acknowledging that the state "might ultimately obtain [this] evidence as a result of a defendant's exercise of his right to an independent test," it insists that this "does not convert the test to a police-initiated search."

### B. Analysis

#### 1. Adequacy of Bluel's briefing

■ We turn first to the state's assertion that Bluel has inadequately briefed his constitutional claims, thus waiving these points.

**2.** *Id.* at *2.

**3.** *Id.*

**4.** *Id.*

Although we ultimately rest our decision in this case on evidentiary grounds, the constitutional issues raised by Bluel remain relevant since Bluel relies on the factual and legal underpinnings of his constitutional arguments to reinforce his claims of evidentiary error. Given the close connection between the constitutional and evidentiary claims, we think that it would be inappropriate to accept Bluel's theory of evidentiary error if, as the state suggests, his constitutional arguments failed to provide an adequate basis for meaningful appellate review. Accordingly, our reliance on an evidentiary rationale does not permit us to avoid the state's claim of waiver.

■ Upon reviewing Bluel's briefing, we find no merit to the state's claim of inadequate briefing.[5] Bluel's opening brief identifies and describes his constitutional claims; it devotes more than ten pages of argument to these claims; and it appropriately cites, quotes, and discusses a substantial body of legal authority—including pertinent constitutional provisions, as well as many relevant cases—to support the constitutional arguments he advances. Although the state depicts these efforts as inadequate to allow a meaningful response or review, its own detailed and accurately targeted responses to Bluel's claims dispel this assertion.[6]

In our view, Bluel's briefing of his constitutional claims falls comfortably within the minimum range necessary to enable meaningful appellate review. We thus reject the state's contention that these claims are inadequately briefed and will consider Bluel's constitutional arguments to the extent that they illuminate the central question: whether the trial court abused its discretion in admitting the evidence of Bluel's refusal.[7]

### 2. Admissibility of Bluel's refusal under Evidence Rule 403

#### a. Rule 403's balancing test

■ The Alaska Rules of Evidence generally require courts to determine the admissibility of potentially prejudicial evidence by carefully balancing its probative value against its danger of causing unfair prejudice. Evidence Rule 403 describes the required balancing test:

> Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. [8]

Trial courts have broad discretion when applying this balancing test to determine the admissibility of disputed evidence; their decisions are ordinarily subject to reversal on appeal only when our review of the record convinces us that an abuse of discretion occurred.[9]

Here, as we have already indicated, Bluel argues that the disputed evidence carried a disproportionate danger of unfair prejudice by creating the impression that his refusal of the independent test amounted to an admission of guilt. The state counters that the evidence of refusal was properly admitted not to show that Bluel's exercise of his right

---

**5.** The adequacy of Bluel's briefing presents a question of law that we determine independently. *See Wilkerson v. State, Dep't of Health & Social Servs.*, 993 P.2d 1018, 1021 (Alaska 1999).

**6.** Moreover, the lone case the state cites to support its claim of deficient briefing is readily distinguishable on its facts. The state cites *Great Divide Insurance Co. v. Carpenter ex rel. Reed*, 79 P.3d 599, 608 n. 10 (Alaska 2003), for the proposition that "inadequately briefed claims are 'considered waived.'" But the briefing found inadequate in *Great Divide* consisted of a single unexplained quotation from a treatise; the brief failed to explain or argue the quotation, though it appeared to make an "oblique attack" on a jury instruction that had not been challenged at trial. *Id.* at 608. These circumstances bear little similarity to the relatively robust briefing claimed to be inadequate here.

**7.** As the state acknowledges and our own examination confirms, Bluel's current briefing of his constitutional claims is essentially identical to his briefing in the court of appeals. It follows that our ruling as to the adequacy of his current briefing also extends to his court of appeals briefing. In our view, his constitutional claims should not have been rejected below as inadequately briefed.

**8.** Alaska R. Evid. 403.

**9.** *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980).

of refusal revealed a consciousness of guilt, but rather to impeach his trial testimony claiming surprise at his failing score on the DataMaster—testimony the state now portrays as a tactical choice intended to mislead the jury.

To decide the relative merits of these conflicting claims, we begin by examining the refusal's probative value as evidence tending to impeach Bluel's testimony claiming surprise. We then assess the potential prejudice alleged by Bluel—the danger that evidence of his refusal might have unfairly led the jury to view his decision to exercise his right of refusal as a "badge of guilt." [10] Last, we balance the danger of unfair prejudice against the evidence's probative value to determine whether the potential danger predominated so greatly as to leave us firmly convinced that admitting the challenged evidence amounted to a clear abuse of discretion under Evidence Rule 403.

### b. Probative value

Alaska Evidence Rule 401 defines relevance to include all evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [11] Evidence Rule 402 then makes all relevant evidence presumptively admissible:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or of this state, by enactments of the Alaska Legislature, by these rules, or by other rules adopted by the Alaska Supreme Court. Evidence which is not relevant is not admissible. [12]

■ Under these broad standards, the challenged evidence of Bluel's refusal unquestionably qualified as relevant evidence because it had at least some tendency to make Bluel's testimonial claim of surprise "less probable" than it might have been otherwise; thus, "unless otherwise provided" by law, the Evidence Rules, or another rule adopted by this court, the evidence could properly be admitted. [13]

■ But the refusal's relevance does not end the inquiry. As we have seen, Evidence Rule 403 expressly allows courts to exclude relevant evidence whose probative value fails to outweigh its prejudicial impact, so we must separately ask how much relevance the refusal actually had.

The state's theory of relevance focuses on the refusal's impeachment value, asserting that evidence of the refusal was needed to discredit Bluel's testimonial claim that his failing score on the breath test had caused him surprise. The theory is plausible, but not problem free.

On the one hand, to the extent that Bluel's refusal of an independent test might reasonably be seen as reflecting his consciousness of guilt, evidence of the refusal would indeed have probative impeachment value, since it would tend to undercut his claim of surprise. But on the other hand, to the extent that Bluel's refusal could reasonably have been motivated by something other than his awareness of guilt, the probative force of the evidence to show lack of surprise would diminish proportionately.

Here Alaska law gave Bluel a right to decline an independent test. Because of this right, the possibility that Bluel refused the independent test for reasons unrelated to guilt cannot be lightly discounted.

■ Alaska's implied consent law authorizes the state to give DWI arrestees a chemi-

10. *Cf. Elson v. State,* 659 P.2d 1195, 1197 (Alaska 1983) (determining that admitting evidence of a defendant's refusal to consent to a search "would make meaningless the constitutional protection against unreasonable searches and seizures if the exercise of that right were allowed to become a badge of guilt") (citing *Bargas v. State,* 489 P.2d 130, 132 (Alaska 1971)).

11. Alaska R. Evid. 401.

12. Alaska R. Evid. 402.

13. Alaska R. Evid. 402; *cf. McCormick v. Municipality of Anchorage,* 999 P.2d 155, 158–59 (Alaska App.2000) (admitting evidence of refusal to perform field sobriety test when no right of refusal existed); *Srala v. Municipality of Anchorage,* 765 P.2d 103, 105–06 (Alaska App.1988) (admitting evidence of refusal of blood test when no right of refusal existed).

cal breath test to determine blood alcohol[14] —currently the DataMaster test—and forbids all other compelled testing except in circumstances not relevant here.[15] The implied consent law also recognizes that, after submitting to the required test, DWI arrestees are entitled to obtain an independent test of their own choice.[16] The independent test serves to give DWI arrestees an opportunity to challenge the breath-test evidence the state compelled them to submit.[17] The right to an independent test is thus optional: DWI arrestees are free to decline it; they may arrange the testing themselves; or they may ask the state for assistance in obtaining the test.[18] The person administering the mandatory breath test must "clearly and expressly inform the person tested of that person's right to an independent test."[19] If the person requests an independent test, the state must "make reasonable and good-faith efforts to assist"; if not, the law allows no further compelled testing.[20]

In keeping with these requirements, Bluel was notified of his right to an independent test. He was also warned that if he opted to request a test "it would be possible that evidence from the independent test [might] be obtained by the State through legal process and used against [him]." But the notice said nothing to suggest that Bluel's decision to decline an independent test might later be used against him.

In accusing Bluel of attempting to mislead the jury by claiming surprise at the result of his breath test, the state seems to assume that no defendant who is genuinely surprised at failing a DataMaster breath test would decline to ask for an independent test. But this assumption overstates the probative force of the refusal.

In a similar factual setting, we recognized in *Elson v. State* that a defendant's refusal to consent to a search could be motivated by circumstances unrelated to guilt, such as legal uncertainty or a desire to consult with an attorney before taking any action.[21] Here, the state advances no sound reason to assume that Bluel's decision was not motivated by similar considerations. To be sure, as the state points out, in *Elson* we dealt with the constitutional right to refuse a warrantless search, whereas, in the state's view, Bluel merely had, and chose not to assert, a statutory right to request further testing. But while this distinction impacts the importance of the right Bluel did choose to assert—the right to refuse the test—and the consequent need to protect its assertion, it says nothing about the likelihood that Bluel might have chosen to assert his right of refusal for an innocent reason—a reason compatible with being surprised.

Accordingly, *Elson's* discussion describing the inherent ambiguity of a decision to refuse consent to a search appears applicable here as well. If anything, the possibility of an innocent basis for refusal seems more likely here, given the nature of the statutory right to an independent test. When DWI arrestees can afford to pay for their own testing and are able to secure their release on bail shortly after being remanded to jail, the implied consent law will still allow them to make their own arrangements for independent testing.[22] The law also requires them to be informed of their right to arrange an independent test after submitting to the mandatory breath test.[23] Thus, a DWI arrestee who declines an independent test is on notice that the only right his decision "waives" is the right to ask the state for help in obtaining the test. Because Bluel's refusal would not have precluded him from later

14. AS 28.35.031(a).

15. *See* AS 28.35.031(g); *Sosa v. State,* 4 P.3d 951, 953–54 (Alaska 2000).

16. AS 28.35.033(e).

17. *Gundersen v. Municipality of Anchorage,* 792 P.2d 673, 675–76 (Alaska 1990).

18. AS 28.35.033(e).

19. *Id.*

20. *Id.*

21. *Elson v. State,* 659 P.2d 1195, 1198–99 (Alaska 1983).

22. *See* AS 28.35.033(e).

23. *Id.*

arranging a test on his own, it did not by itself rule out an intent to obtain an independent test.

Of course, this does not mean that Bluel's decision to decline independent testing lacked probative force; to the contrary, the refusal would still tend to make his claim of surprise less probable, so it would continue to be relevant under Evidence Rule 401 and presumptively admissible under Rule 402. But the possibility of circumstances consistent with Bluel's claim of surprise necessarily reduces the refusal's probative force as impeachment evidence: though the refusal would potentially be inconsistent with surprise, it would not necessarily establish that Bluel was attempting to mislead the jury, as the state claims he was.

As we will explain below in considering the prejudicial impact of refusal evidence, this distinction between evidence whose probative force arguably establishes an inconsistency and evidence that obviously contradicts a witness's story can play an important role when the state seeks to impeach testimony with evidence of prior silence or refusal to act. In first considering the refusal's probative value, however, it suffices to observe that the uncertainty surrounding Bluel's reasons for declining does not allow us to conclude that his refusal had impeachment value strong enough to solidly conflict with his claim of surprise or to convincingly prove an attempt to mislead the jury.

### c. Potential prejudice

■ On the opposite side of Rule 403's balance, we must weigh the possible negative effects of the refusal evidence: "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[24] Here, these dangers seem manifest. The state's use of the refusal raised a serious risk of inviting the jury to view Bluel's decision not to request an independent test as a silent admission of guilt. In terms of its potential for unfair prejudice, then, this evidence created a risk of prejudice similar to the one we considered in *Elson v. State*.[25]

*Elson* held that an intolerable risk of prejudice arises when the state is allowed to comment on a defendant's refusal to consent to a warrantless search.[26] In reaching this conclusion, *Elson* relied on two earlier cases, *Bargas v. State* and *Padgett v. State*.[27] Both cases involved refusals to submit to warrantless searches that would have been illegal without the defendant's consent.[28]

*Bargas* held that allowing the state to comment on a refusal in this setting would be "entirely impermissible. It would make meaningless the constitutional protection against unreasonable searches and seizures if the exercise of that right were allowed to become a badge of guilt."[29] Analogizing the situation to cases barring comment on assertion of the Fifth Amendment right to silence, *Bargas* ruled that "[a] like principle applies here. One's assertion of his constitutional right not to submit to a search of his person cannot be used as evidence of guilt if this constitutional right is to have any meaning."[30]

*Padgett*, like *Bargas*, found evidence of a refusal to allow an unauthorized search to be inadmissible, emphasizing that the right to refuse "would be effectively destroyed if, when exercised, it could be used as evidence of guilt."[31]

In *Elson* we considered whether the principles discussed in *Bargas* and *Padgett* should extend to a case involving a refusal to submit to a potentially legal search. We expressly held that they should, concluding that "evidence of a refusal to consent to a search is inadmissable regardless of the le-

---

**24.** Alaska R. Evid. 403.

**25.** *Elson v. State,* 659 P.2d 1195 (Alaska 1983).

**26.** *Id.* at 1197–99.

**27.** *Id.* at 1197–98 (citing *Padgett v. State,* 590 P.2d 432, 434 (Alaska 1979); *Bargas v. State,* 489 P.2d 130, 133 (Alaska 1971)).

**28.** *Id.* at 1198.

**29.** *Bargas,* 489 P.2d at 132.

**30.** *Id.* at 133.

**31.** *Padgett,* 590 P.2d at 434.

gality of the search." [32] In reaching this conclusion, we stressed that asking a person to submit to a search confronts the person with "a difficult dilemma" because of the inherent uncertainties of the situation:

> As Elson points out, the legality of a search is often determined long after the fact, and thus a person who is asked to consent to a search would not know whether he is protecting or prejudicing himself by choosing not to consent. If the person consents, the fruits of the search would be admissible regardless of whether the police had the right to search without consent. If the person believes the search is impermissible and withholds his consent, he risks having his refusal considered as an admission of guilt if it is later ascertained that the nonconsensual search was permissible. An individual in this situation would have to balance a desire to assert his perceived fourth amendment rights against the risk of self-incrimination. This tension is magnified by the fact that in deciding whether to consent to a search, the individual is usually acting without the benefit of counsel's advice as to the legality of the police conduct and the possible success of fourth amendment objections. [33]

In our view, the dilemma faced by the defendants in *Elson, Padgett,* and *Bargas* was functionally and legally indistinguishable from the dilemma Bluel faced here. As the state acknowledges, once Bluel submitted to the DataMaster test, Alaska's implied consent law entitled him to an independent test; under the law he could opt to arrange a test of his own choosing, ask for help in obtaining a test, or choose no test at all. In offering to help Bluel obtain an independent test, the state's standard "Notice of Right to an Independent Test" form expressly told him that if he did choose to have an independent test, the state could seek to obtain the evidence and use it against him. The state does not seem to dispute that the independent test would have required a physical intrusion sufficient to qualify as a search. [34] Nor does the state dispute that the implied consent law required the state to honor Bluel's choice; in other words, that the law precluded the state from compelling Bluel to submit to another blood-alcohol test. [35]

In terms of its practical consequences, then, Bluel's refusal to accept the state's offer to arrange an independent test is indistinguishable from a refusal to consent to a search. Moreover, the provisions of Alaska's implied consent laws that give Bluel the right to choose whether to obtain an independent test reflect the same "carefully balanced" consideration of policy interests that would have precluded Bluel from being ordered to submit to another test. [36]

Finally, the statutory right to an independent test implicates concerns for fundamental fairness rooted in the due process right to effectively analyze and challenge the reliability of the state's compelled breath-test evidence. [37] We have described this due process right as one that is "closely analogous, if not equivalent, to" the right of cross-examination, since it affords the defendant the opportunity to "bring out facts which will tend to discredit" the results of the mandatory test. [38] Just as a decision to bypass the opportunity for cross-examination creates no inference of guilt, a decision to bypass an independent

---

**32.** *Elson,* 659 P.2d at 1199.

**33.** *Id.* at 1198–99 (footnote omitted).

**34.** *See, e.g., State v. Blank,* 90 P.3d 156, 159 n. 19 (Alaska 2004) ("A breath test is a search.").

**35.** *See Sosa,* 4 P.3d at 955.

**36.** *See id.*

**37.** *See Gundersen v. Municipality of Anchorage,* 792 P.2d 673, 676 (Alaska 1990) ("Since a defendant must provide the state with potentially incriminating evidence at the risk of criminal penalties, we hold that due process requires that the defendant be given an opportunity to challenge the reliability of that evidence . . . .").

**38.** *Lauderdale v. State,* 548 P.2d 376, 381 (Alaska 1976) ("[Lauderdale] is asking for an opportunity to test the reliability or 'credibility' of the breathalyzer test results. This is closely analogous, if not equivalent, to the case where defense counsel, by cross-examination, tests the credibility of a witness who testifies against an accused. Cross-examination in such a case is a matter of right, and the purpose of that right is to attempt to bring out facts which will tend to discredit the witness by showing that his testimony was untrue.").

test also cannot properly be seen as a "badge of guilt."

For all of these reasons, even if evidence of Bluel's right to refuse testing might not have directly violated any constitutional rights, we conclude that this evidence exposed him to essentially the same risk of unfair prejudice as commenting on his assertion of the constitutional right to refuse an unreasonable search. Thus, Bluel is entitled to a commensurate level of protection from such evidence; that is, he is entitled to insist that his exercise of the right to refuse independent testing not be chilled by the state's use of his refusal as a "badge of guilt." [39]

### d. Result of applying Rule 403's balancing test

■ The state suggests that the disputed evidence of Bluel's refusal meets this test for admission. Asserting that it "offered the evidence for the sole purpose of impeaching Bluel's testimony that he was surprised at and did not believe the DataMaster result," the state disclaims using the refusal to prove Bluel's consciousness of guilt and insists that "any chilling effect was the sole product of Bluel's own tactical decisions." But as already pointed out in our discussion of probative value, the refusal's probative value for impeachment is not as strong as the state contends; it does not necessarily conflict with Bluel's claim of surprise.

Moreover, courts have generally tended to be wary of attributing probative force to inaction. In *Nighswonger v. State,* for example, the court of appeals reversed a decision declining to issue a pretrial order precluding the state from cross-examining a defendant's alibi witness about the witness's invocation of the right to silence in an earlier courtroom appearance.[40] There the state cited a number of cases allowing impeachment by prior silence.[41] But after reviewing the cases and the witness's proposed testimony, the court

determined that the cases were distinguishable since they "involved witnesses who took positions in their subsequent testimony which [were] blatantly inconsistent with prior silence." [42] As an example, the court pointed out that "cross-examination ... is considered proper where a witness creates the false impression on direct examination that he willingly cooperated with the prosecution or that he gave the same testimony ... at a prior hearing." [43] Because the witness's proposed testimony in *Nighswonger* was not blatantly inconsistent with her silence, the court held that the challenged questioning about prior silence should have been excluded.[44]

The justification for admission found lacking in *Nighswonger* is likewise absent here. While the claim of surprise Bluel asserted at trial was arguably inconsistent with his earlier decision to decline the offer of an independent blood test, potentially innocent explanations for the refusal preclude a finding of blatant inconsistency. Moreover, whatever "false impression" Bluel might have created by claiming surprise, he did not create it during his direct examination. To the contrary, the prosecution deliberately elicited the claim of surprise on cross-examination.

Soon after the trial began, Bluel's attorney called the court's attention to a pre-trial order issued by another judge that precluded the state from using Bluel's refusal in its case-in-chief. The state confirmed that it would not use the evidence in its case-in-chief and would wait to see if it became relevant when Bluel presented his defense. After the state rested its case, Bluel took the stand in his own defense and testified that he drank less than two full drinks before being arrested. On cross-examination, the prosecutor expressly broached the subject of surprise by framing it as a leading question; immediately upon receiving Bluel's answer, the state asked Bluel about his refusal:

---

**39.** *See Elson,* 659 P.2d at 1197 (citing *Bargas,* 489 P.2d at 132).

**40.** *Nighswonger v. State,* 662 P.2d 445, 446 (Alaska App.1983).

**41.** *Id.* at 448 n. 2.

**42.** *Id.*

**43.** *Id.* (citing *United States v. Sing Kee,* 250 F.2d 236, 240 (2d Cir.1957), *cert. denied* 355 U.S. 954, 78 S.Ct. 538, 2 L.Ed.2d 530 (1958)).

**44.** *Id.* at 448.

Q: Now, Mr. Bluel, you were taken to the station after you were—after the trooper felt that you were intoxicated. What happened at the station? I should say, what was your reading on the DataMaster?

A: .091.

Q: And now you said you'd had only one drink for the entire evening; is that correct? You'd been at the Badger Den for four hours, but you'd only had one drink?

A: Yes. I had—and some of that last drink there before we left, but not all.

Q: And well now, is it a little sip of it or some of it, but not all of it?

A: Maybe a quarter of it.

Q: Okay. .091, that's over the legal limit. I mean, you know that, right?

A: I didn't believe I was.

Q: So you must have been pretty surprised when lo and behold, your breath alcohol is .091 if you only had one drink; is that correct?

A: Yes.

Q: And did you have an option to have a second test?

A: Yes.

Q: And what was that—that test?

[Defense Attorney]: Your Honor, may we approach briefly?

The state asserts that Bluel opened the door to impeachment by claiming surprise; it professes that it "offered the evidence for the sole purpose of impeaching Bluel's testimony that he was surprised at and did not believe the DataMaster result." But since the state created its own need to impeach on this point, it seems difficult to credit its argument that Bluel opened the door. Rather, the state opened the door and led Bluel to the very statement that it now claims was an affirmative attempt to mislead the jury.

 Impeachment evidence offered on the theory that the witness opened the door ordinarily "is considered proper where a witness creates the false impression on direct examination." [45] If we ignored this consider-

ation and allowed the state's bootstrapped justification for impeachment to prevail, then virtually all defendants who declined an independent test and testified at trial could be targeted for impeachment by prior refusal unless they admitted that they were not surprised when learned that they failed their breath test.

As Bluel rightly observes, this rule would subvert the basic purpose of the independent test and leave individuals arrested for DWI a Hobson's choice:

> What was intended to be a due process/fair trial safeguard [would be] turned into a two-edged blade—if the DWI arrestee elects to have an independent blood-draw, the State will apply for and obtain a search warrant to have the blood tested, then use the result to advance its case against the arrestee, if the results favor the State. However, if, on the other hand, the DWI arrestee declines to have an independent blood-draw, the State [will then use] the arrestee's decision at trial as evidence to argue that the defendant implicitly agrees with the breath-alcohol test, thereby creating an inference of guilt.

To summarize, then, evidence that Bluel declined an independent test did not blatantly conflict with his testimony claiming surprise at the result of the DataMaster breath test. Bluel's claim of surprise arose only because the state affirmatively elicited it to justify admitting the evidence of refusal. But in the absence of a claim of surprise that was blatantly inconsistent with Bluel's prior refusal and that he injected into the case himself, we conclude that the refusal created a danger of unfair prejudice greatly outweighing the refusal's probative value for impeaching the claim of surprise. We accordingly hold that allowing the state to admit evidence of the refusal amounted to an abuse of discretion under Evidence Rule 403.

## IV. CONCLUSION

For these reasons, we REVERSE the decision of the court of appeals, VACATE the judgment of conviction entered by the dis-

45. *See id.* at 448 n. 2.

trict court, and REMAND to the district court for a new trial.