**Keith JONES, Appellant,**

v.

**BOWIE INDUSTRIES, INC., Todd Christianson, Great Alaska Lawn and Landscaping, Inc., and AIG, Appellees.**

**Bowie Industries, Inc., Cross–Appellant,**

v.

**Keith Jones, Todd Christianson, Great Alaska Lawn and Landscaping, Inc., and AIG, Cross–Appellees.**

**Nos. S–13227, S–13247.**

Supreme Court of Alaska.

June 29, 2012.

---

Michael W. Flanigan, Walther & Flanigan, Anchorage, for Appellant/Cross–Appellee Keith Jones.

John J. Tiemessen and Lisa C. Hamby, Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC, Fairbanks, for Appellee/Cross–Appellant Bowie Industries, Inc.

Kevin T. Fitzgerald, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellee/Cross–Appellee Todd Christianson.

No appearance by Appellee/Cross–Appellee Great Alaska Lawn and Landscaping, Inc.

Notice of non-participation of Appellee/Cross–Appellee AIG filed by Robert L. Griffin, Griffin & Smith, Anchorage.

Before: CARPENETI, Chief Justice, FABE, and WINFREE, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

A worker suffered a traumatic above-the-knee amputation of his right leg in a work-related accident in 2003. The accident happened when he used his foot to push a bale of mulch that he was feeding into a machine; his leg was caught in the machine and amputated. He received workers' compensation benefits for the injury and later sued the manufacturer and the owner of the machine under various tort theories. After trial a jury found that the manufacturer was not negligent and the product was not defective. It also found that the company that owned the machine at the time of the accident was negligent, but that its negligence was not a legal cause of the accident. After finding that the worker and his employer were negligent and that their negligence was a cause of

the accident, the jury apportioned fault for the injury between them. Because we conclude that the superior court erroneously admitted evidence of the worker's receipt of workers' compensation and social security benefits and his past drug use, we reverse the trial court's judgment and remand for a new trial.

## II. FACTS AND PROCEEDINGS

Keith Jones worked for Titan Enterprises, LLC in 2003. Before working for Titan, he worked for Great Alaska Lawn and Landscaping, Inc. Todd Christianson was the sole shareholder of both corporations. In November 2002 Great Alaska Lawn was involuntarily dissolved by the State of Alaska; also in November 2002 Christianson incorporated Titan. In June 2003, while working for Titan, Jones was injured on a hydromulcher designed and manufactured by a predecessor corporation to Bowie Industries, a Texas corporation. Christianson testified that Great Alaska Lawn owned the hydromulcher on which Jones was injured.

A hydromulcher is a piece of equipment used to seed and fertilize land for lawns and landscaping. To use a hydromulcher, the operator first begins to fill the hydromulcher's tank with water; he then adds seed, fertilizer, and mulch to the tank. Agitators in the machine mix the ingredients into a slurry, which is sprayed onto land for landscaping. The hydromulcher here, a Bowie 1500 Imperial Hydromulcher, used a shredder bar—a rotating shaft with teeth—to tear apart bales of mulch as they were fed through a hole in the top of the hydromulcher. The hydromulcher on which the accident happened had no guarding around the opening where the mulch was fed into the machine except a six-inch raised lip and a hinged lid.

Jones was working alone on the hydromulcher on June 5, 2003. After attaching the water hose to a fire hydrant to fill the hydromulcher's tank, he climbed onto the hydromulcher to feed the other ingredients into the machine. One of the bales of mulch did not feed properly, so he pressed down on the bale with his foot to force it into the

machine, as he had done in the past and seen other workers do.[1] When he did so, his foot was caught by the shredder bar, which pulled him into the machine. He screamed, and a passer-by who heard him was able to stop the hydromulcher by disabling the engine. By the time the hydromulcher stopped, Jones's right leg had been amputated above the knee.

Jones received workers' compensation benefits from Titan for the injury. He sued Bowie Industries and Todd Christianson both individually and doing business as Great Alaska Lawn and Landscaping, Inc. Jones alleged that (1) Bowie was strictly liable because of the defective design of the hydromulcher; (2) Bowie was negligent in designing the hydromulcher and in failing to warn of the dangers in using the machine; and (3) Great Alaska Lawn was negligent in providing unsafe equipment to Titan and in failing to warn Jones and Titan about the dangers in using the hydromulcher. Jones later filed an amended complaint, adding Christianson's name to the allegations against Great Alaska Lawn. Bowie and Christianson answered, and trial was scheduled to begin on August 13, 2007.

In May 2007 Bowie filed two motions pertinent to this appeal. It asked the court for a legal ruling that it had "no post-sale duty to warn of risks or safety improvements" related to the hydromulcher. It also moved to allocate fault at trial to Titan, Jones's employer at the time of the accident. After Bowie filed its allocation motion, AIG, Titan's workers' compensation insurer, moved to intervene in the case to protect its lien against any judgment Jones might obtain.[2] The court permitted AIG to intervene in July 2007. The court denied Bowie's motion about its post-sale duty to warn without explanation.

The parties filed motions in limine in anticipation of trial. Jones sought to exclude evidence related to his receipt of workers' compensation and social security disability benefits. Bowie opposed excluding this evidence, arguing that "[t]he availability of these benefits can be considered when determining whether Plaintiff has mitigated his damages." It argued that because workers' compensation and social security were "matters of common knowledge[, t]he jury [would] assume that Plaintiff received workers['] compensation and social security benefits." The court decided to admit evidence of workers' compensation and social security benefits "for the limited purpose discussed."

Jones also asked the court to exclude evidence related to drug testing and chemical dependency treatment. Bowie moved affirmatively for admission of Jones's drug-use history, arguing that it was relevant to Jones's wage-earning capacity both before and after the accident. In opposition to Jones's motion, Bowie argued that the substance abuse treatment records should be admitted because they were relevant to future lost earnings. The court ruled that Jones's drug-use history was not admissible.

The case went to trial in February and March 2008. Jones presented expert opinion evidence that the hydromulcher had been defectively designed. He also presented evidence that Bowie was aware of problems with workers getting caught in the hydromulcher and in 1974 had sent a letter containing safety warnings to owners it could then identify. He introduced evidence that the hydromulcher on which Jones was injured did not comply with state regulatory standards for guarding during the entire time Great Alaska Lawn possessed it, and that Great Alaska Lawn had "loaned" the hydromulcher to Titan in 2003, only transferring legal ownership of the hydromulcher to Titan in 2005. In an attempt to undercut Bowie's allegations that he was malingering, Jones presented medical testimony about the difficulties he had adjusting to a prosthesis. Jones presented both lay and expert testimony about damages. Dr. Richard Parks,

---

**1.** Witnesses used different terms to describe what they did with their feet to force bales that were not feeding properly into the opening, and it is not entirely clear from the record what Jones did when the accident happened.

**2.** Because Jones received workers' compensation benefits for the injury, AIG was entitled to reimbursement of the benefits, but the reimbursement amount could be reduced by the amount of fault allocated to Titan. *See* AS 23.30.015(g).

Jones's economics expert, gave two estimates of future economic loss, one based on the assumption that Jones would have continued to work in the landscaping industry, and one based on an assumption that Jones would have returned to work as a fuel truck driver, a position he held from 1989 to 1998.

At the end of Jones's case-in-chief, the court granted a directed verdict to Christianson individually, finding that Jones had not offered sufficient evidence to pierce the corporate veil. The court permitted the case to go forward against Great Alaska Lawn. At this time Bowie asked the court to dismiss any negligence claims against it, arguing that these claims were extinguished by the statute of repose; the court refused to do so. Bowie also asked for a directed verdict on Jones's punitive damages claim, which the court denied.

Bowie's main contentions in its case were that (1) the hydromulcher had adequate safety features; (2) any danger from the shredder bar was open and obvious so no warning or other guarding was needed; (3) no additional safety measures would have prevented the accident; and (4) Jones's use of his foot to force the mulch bale into the machine was the cause of the accident. It called a former Bowie dealer to testify about his own construction of a hydromulcher in the 1960s and about safety standards in hydromulcher operation. Bowie presented testimony from experts in safety engineering and in biomechanics that further warnings were not necessary because of the obvious danger from the shredder bar and that any additional guarding would not have prevented the accident.

Bowie countered Jones's damages claims through the testimony of its vocational expert, Dr. Anthony Choppa. Dr. Choppa testified that it would be unlikely for Jones to be able to secure work as a fuel truck driver because of "issues in his background." Bowie then asked the court for permission to bring in evidence of Jones's past drug use, arguing that Dr. Parks's testimony about Jones's potential future earnings based on being a fuel truck driver would mislead the jury. According to Bowie, there was "definitely" a difference between being a fuel truck driver and a truck driver. The court permitted Bowie to ask questions related to Jones's past drug use, ruling as follows:

> The court's considered this under [Alaska Evidence Rule] 403, which I think is the issue, whether it's more prejudicial than probative. Looking at—first of all, I'm going to find it's probative. And then the question is, is it information that wasn't in his report that should have been previously disclosed, or is it based upon testimony brought out at trial or focused more at trial, I guess, on a fuel truck driver versus a truck driver. I'm going to find it is. I'm going to allow them to ask the questions.

Jones informed the court that its ruling would require him to call rebuttal expert witnesses.

The next day Jones asked the court for permission to call a rebuttal witness from the trucking industry to counter Dr. Choppa's testimony. Bowie objected, arguing that it was improper rebuttal. The court permitted Jones to call the witness over Bowie's objection.

On the last day of trial, after closing argument had begun, Bowie filed a supplemental brief arguing that the court did not have jurisdiction to award punitive damages against Bowie because Texas, the state where Bowie had its principal place of business, had specifically rejected a post-sale duty to warn. The court decided to let the issue of punitive damages go to the jury on Jones's post-sale failure to warn claim.

The jury decided that (1) the hydromulcher was not defective; (2) Bowie was not negligent for failing to provide reasonably adequate warnings after 1966; (3) Bowie's failure to provide reasonably adequate warnings was not a legal cause of Jones's injury; (4) Bowie was not negligent; (5) no negligence by Bowie was a legal cause of Jones's accident; (6) Great Alaska Lawn was negligent in providing the hydromulcher to Titan; (7) Great Alaska Lawn's negligence was not a legal cause of Jones's injuries; (8) Titan was negligent; (9) Titan's negligence was a legal cause of Jones's injuries; (10) Jones suffered damages of $1,123,123.00; (11) Jones failed to mitigate his economic losses; (12) Jones

was negligent; and (13) Jones's negligence was a legal cause of his injury. The jury allocated fault 70% to Jones and 30% to Titan. It also "recommend[ed] that any future economic loss ... be held in trust by a third party and used for appropriate medical expenses."

Jones objected that the jury's verdict was inconsistent. His specific objections were based on the findings that Great Alaska Lawn was negligent in supplying the equipment but that its negligence was not a legal cause of the accident and that Titan was negligent and its negligence was a legal cause of the accident. The court found that the verdict was not internally inconsistent because state safety regulations required Titan to repair any lack of guarding before it used the machine. Therefore, even if Great Alaska Lawn negligently supplied the equipment, this need not have been a legal cause of the accident—by the time Jones was hurt, Titan had assumed responsibility for the equipment and its operation.

Jones moved for a new trial against Great Alaska Lawn and Bowie, arguing that the court had improperly admitted prejudicial evidence and that the weight of the evidence was against the jury's verdict. Bowie opposed the motion,[3] and the court denied it. The court concluded that the evidence of workers' compensation benefits was properly admitted for the purpose of showing malingering and that Jones had countered Bowie's evidence with his own expert's opinions about his ability to return to work. The court also concluded that the drug use evidence was properly admitted for the purpose of showing that Jones "would not likely be eligible to drive a fuel truck in Anchorage in the future[,] ... not for any other purpose." The

court decided that the weight of the evidence was not against the jury's verdict and the verdict was not inconsistent.

Jones appeals the court's denial of the motion for a new trial, the admission of overly prejudicial evidence, the directed verdict against Christianson, and the court's refusal to give a negligence per se jury instruction against Great Alaska Lawn. Bowie cross-appeals the court's decisions to instruct the jury on a post-sale duty to warn and punitive damages, the court's ruling on the statute of repose, and the court's decision to permit Jones to call his rebuttal witness to testify about the trucking industry.

## III. STANDARD OF REVIEW

We review a trial court's decision to admit or exclude evidence for an abuse of discretion.[4] We review a trial court's decision under Alaska Evidence Rule 403 by "balanc[ing] the danger of unfair prejudice against the probative value of the evidence 'to determine whether the potential danger predominated so greatly as to leave us firmly convinced that admitting the challenged evidence amounted to a clear abuse of discretion under Evidence Rule 403.' "[5]

When we review the grant of a directed verdict, we "must decide 'whether the evidence, when considered in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment.' "[6] "We review the decision to submit a punitive damages determination to the jury for abuse of discretion."[7] We find an abuse of discretion when, after reviewing the whole record, we are left with a definite and firm conviction that the trial court erred in its ruling.[8]

---

3. Christianson also opposed the motion for a new trial, although he only made arguments related to Great Alaska Lawn. The court indicated that it did not consider his arguments on behalf of Great Alaska Lawn because his attorney had never entered an appearance for Great Alaska Lawn.

4. *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118 (Alaska 2009) (citing *Yang v. Yoo*, 812 P.2d 210, 217 (Alaska 1991)).

5. *Brandner v. Hudson*, 171 P.3d 83, 87 (Alaska 2007) (quoting *Bluel v. State*, 153 P.3d 982, 986 (Alaska 2007)).

6. *Noffke v. Perez*, 178 P.3d 1141, 1144 (Alaska 2008) (quoting *Hagen Ins., Inc. v. Roller*, 139 P.3d 1216, 1219 (Alaska 2006)).

7. *Pederson v. Barnes*, 139 P.3d 552, 562 (Alaska 2006) (citing *Wal–Mart, Inc. v. Stewart*, 990 P.2d 626, 637 (Alaska 1999)).

8. *Liimatta v. Vest*, 45 P.3d 310, 313 (Alaska 2002) (quoting *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982)).

 We review questions of law de novo, "adopting 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[9] Interpretation of a statute is a question of law to which we apply our independent judgment, interpreting the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.[10]

## IV. ISSUES RELATED TO JONES'S APPEAL

### A. It Was Error To Admit Evidence Of Jones's Receipt Of Benefits And His Use Of Drugs.

Jones argues that the trial court erred by admitting evidence of his receipt of workers' compensation and social security benefits and evidence of his drug use five years before the accident. Jones contends that this evidence was unduly prejudicial and that its admission was harmful to him. He maintains that the benefits evidence should have been excluded under the collateral source rule, which "exclud[es] evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff on the issues of liability and damages."[11] Jones also asserts that the drug use evidence had little probative value to the main issues of the case and insists that its prejudicial nature outweighed any probative value it may have had. Jones claims that Bowie used the evidence in a highly prejudicial manner. Bowie responds that the court properly exercised its discretion in admitting the evidence and correctly instructed the jury on the limited use of the collateral source evidence.

Both trial court rulings admitting the disputed evidence are governed by Alaska Evidence Rule 403, which provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

When we review a trial court's decision under Rule 403, we "balance the danger of unfair prejudice against the probative value of the evidence 'to determine whether the potential danger predominated so greatly as to leave us firmly convinced that admitting the challenged evidence amounted to a clear abuse of discretion under Evidence Rule 403.' "[12]

### 1. Collateral source benefits

 Before trial Jones moved to exclude evidence of his receipt of workers' compensation and social security disability benefits, relying on earlier cases applying the collateral source rule.[13] Bowie argued in opposition that the evidence should be admitted to show malingering because Jones "enjoyed the same level of pre-accident income, without working at all." It said that it would introduce evidence of his receipt of benefits "to explain why [Jones had] not mitigated his damages and returned to work." The trial court decided to admit the evidence for this purpose.

Jones asked for reconsideration, arguing that Bowie's assertion that it could use the evidence to show that Jones had the same income level without working was factually incorrect, at least with respect to workers' compensation, because he was not getting on-

---

9. *In re Estate of Maldonado*, 117 P.3d 720, 722 (Alaska 2005) (quoting *Carr–Gottstein Props., L.P. v. Benedict*, 72 P.3d 308, 310 (Alaska 2003)).

10. *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003) (citing *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

11. *Tolan v. ERA Helicopters, Inc.*, 699 P.2d 1265, 1267 (Alaska 1985) (citing *Ridgeway v. N. Star Terminal & Stevedoring Co.*, 378 P.2d 647, 650 (Alaska 1963)). Jones also cites to a second part

of the collateral source rule from *Ridgeway*, prohibiting reduction of damages because of receipt of compensation from another source. This, however, was abrogated by AS 09.17.070. *Loncar v. Gray*, 28 P.3d 928, 933 n. 19 (Alaska 2001).

12. *Brandner v. Hudson*, 171 P.3d 83, 87 (Alaska 2007) (quoting *Bluel v. State*, 153 P.3d 982, 986 (Alaska 2007)).

13. *Tolan*, 699 P.2d 1265; *Ridgeway*, 378 P.2d 647.

going cash benefits.[14] Bowie countered that it had averaged Jones's lump-sum payment from the time he received the payment to the time of trial. Bowie also noted that Jones had waived reemployment benefits "in order to receive these benefits" and that the benefits Jones waived were "benefits that [he] now claims as damages in this case."[15] The court denied reconsideration, finding "the arguments of the defense persuasive and the information provided suggestive of malingering."

■ As set out in *Tolan v. ERA Helicopters*,[16] the collateral source rule "exclud[es] evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff on issues of liability and damages."[17] In *Tolan* we did not adopt a rule excluding collateral source evidence in all circumstances; we indicated that "receipt of compensation benefits may be admissible if offered for a purpose other than the diminution of the plaintiff's damages," and instructed trial courts in such cases to weigh the probative value of the evidence against the dangers of unfair prejudice and confusion.[18]

■ More recently, in *Liimatta v. Vest*,[19] we observed that even though courts can admit evidence of collateral source benefits to show malingering, "it is usually acknowledged that the trial judge should exclude such evidence, or admit it only warily" because of the possibility of prejudice to the plaintiff.[20] We also commented with respect to the issue of malingering that "there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of [collateral source benefits]."[21] In *Liimatta* we decided that the trial court's failure to explicitly conduct a balancing test under Alaska Evidence Rule 403 was harmless error "[b]ecause a balancing of the probative value of the evidence against the dangers of unfair prejudice and confusion of the issues and the jury would have dictated exclusion."[22] Our case law thus suggests that collateral source evidence is presumptively prejudicial and should be excluded absent a showing that the evidence is more probative than other available evidence.[23]

In this case, Bowie had other evidence on which to base its claim of malingering or failure to mitigate. At trial Bowie provided documents showing that Jones had not followed through with retraining efforts through the Missouri Division of Vocational Rehabilitation, resulting in the division's closing his case file. It introduced evidence that Jones had not accurately answered interrog-

**14.** Jones had received 26 weeks of temporary total disability (TTD) from June 6 through December 4, 2003; eight weeks of permanent partial impairment (PPI) from December 5, 2003 through January 27, 2004; and a lump sum payment of $67,529.92 (the balance of his PPI) on February 5, 2004.

**15.** Jones waived workers' compensation reemployment benefits in exchange for the balance of his PPI. He received no additional money for the reemployment benefits. Under AS 23.30.190, PPI is calculated by multiplying a fixed dollar amount by the injured worker's degree of impairment related to the work injury. Unless the worker is engaged in the reemployment process, PPI is paid as a lump sum. AS 23.30.041(k), AS 23.30.190(a). When a worker is in the reemployment process, he receives PPI at his TTD rate until PPI is exhausted; if his reemployment plan continues after PPI is exhausted, he may be eligible for additional stipend benefits. AS 23.30.041(k). Jones was eligible for PPI of $70,800, and his TTD rate was $408.76 per week, so had he stayed in the reemployment process, his PPI would not have been exhausted for at least three years. Benefits related to a reemploy-

ment plan end two years from the date of plan acceptance or approval. AS 23.30.041(k).

**16.** 699 P.2d 1265 (Alaska 1985).

**17.** *Id.* at 1267.

**18.** *Id.* at 1268 (citing *DeMedeiros v. Koehring Co.*, 709 F.2d 734, 740–41 (1st Cir.1983)).

**19.** 45 P.3d 310 (Alaska 2002).

**20.** *Id.* at 318 (internal citations and quotation marks omitted).

**21.** *Id.* (internal citations and quotation marks omitted).

**22.** *Id.*

**23.** *See also Loncar v. Gray*, 28 P.3d 928, 932–33 (Alaska 2001) (holding that trial court properly excluded evidence related to Medicaid and Medicare benefits).

atories about jobs he had applied for and had applied for only one job after his injury. It elicited testimony that Jones engaged in a variety of recreational activities and suggested that Jones was capable of more physical activity than he claimed. Because Bowie had other evidence of malingering or failure to mitigate damages that did not carry the same potential for prejudice as Jones's receipt of workers' compensation and social security benefits, the probative value of evidence related to receipt of benefits was reduced.[24]

Bowie relies on *John's Heating Service v. Lamb*[25] to support its position, arguing that in that case we "found in favor of admitting evidence of collateral benefits based on the prior holding in *Tolan*." Bowie's reliance on *John's Heating Service* is misplaced: There we questioned the applicability of the collateral source rule when "the benefits were ostensibly obtained as the result of an entirely separate injury." [26] We upheld the trial court's admission of evidence of disability retirement benefits because the plaintiff's reason for receiving the benefits (a bad back) was inconsistent with his claim in the lawsuit that he was not able to work because of his neurological condition.[27] Here Jones obtained workers' compensation and social security benefits because of the loss of his leg, so the collateral source rule clearly applied.

■ The collateral source rule is founded on concern that information about other sources of recovery can prejudice the jury on issues of liability or lead the jury to think that the plaintiff will get a double recovery.[28] Those considerations were present in Jones's case. The line between an argument for damage reduction and mitigation was very fine in this case, which increased the danger of unfair prejudice. Bowie focused considerable time at trial on Jones's reemployment benefits waiver. The agreement waiving benefits was admitted as an exhibit. Bowie cross-examined Jones about it, asked both

vocational experts about it, and argued in closing that it was evidence of malingering. In closing argument, Bowie attempted to link the lump sum workers' compensation payment to Jones's illegal drug use: After arguing that Jones would not have been able to work as a truck driver because of his "drug problem" and "drug history," Bowie said, "There's a reason he wasn't working. I think you know why. I think you know what happened to the $67,000 from workers' comp and his mom's inheritance, why he's penniless and living in a truck. I think you know why with his history." Bowie also suggested that Jones got a large amount of cash for a variety of reemployment benefits, yet Jones received PPI for the loss of his leg, which he would have gotten whether or not he waived reemployment.

Bowie's use of the evidence related to Jones's workers' compensation benefits was problematic in other ways. Bowie suggested in questioning witnesses and in closing that Jones had been entitled to any accident-related medical benefits he wanted after the time of the accident. For example, Bowie suggested in questioning that Jones was entitled to physical therapy and psychological services through workers' compensation for the five years preceding trial whenever his doctors prescribed them. Bowie also said that to get adaptive devices, Jones's doctors just needed to write him a prescription and workers' compensation would have provided them. Bowie asked the jury to discount Jones's damages request, stating, "If he needed any of this, he could have asked for it in the last five years and workers' comp was obligated to pay for this. He can't say, well, I couldn't afford it." Bowie also said in closing that Jones was "[a]sking for hundreds of thousands of dollars for medical care and counseling that he's had the opportunity for and he's rejected." These arguments could be interpreted as a request for the jury to reduce Jones's damages because of his workers' compensation eligibility.

---

**24.** *See Hiibschman v. City of Valdez,* 821 P.2d 1354, 1366 (Alaska 1991) ("The availability of alternative evidence goes to the probativeness of the evidence in dispute.").

**25.** 46 P.3d 1024 (Alaska 2002).

**26.** *Id.* at 1043.

**27.** *Id.* at 1043–44.

**28.** *See Loncar,* 28 P.3d at 933.

Bowie's argument was likely to cause jury confusion. Eligibility for medical benefits from workers' compensation is not unlimited,[29] and certain types of treatment, such as physical therapy, are subject to additional statutory and regulatory limits.[30] Even if Jones were eligible for future medical benefits through workers' compensation, "AS 23.30.015(g) includes future benefits in the employer's right to reimbursement in the form of a credit."[31] The potential for confusion of issues was high, and even with a limiting instruction, there was a significant danger of unfair prejudice to Jones.

Bowie's use of evidence related to social security benefits was also questionable. It asked Jones's economist to estimate how much money Jones would have to receive in gross income to have a net income equal to the amount of social security benefits he was receiving. Bowie suggested during the economist's testimony that the jury could find that Jones was not entitled to any damages if he had not in fact suffered a reduction in earning capacity, so Bowie's line of questioning about social security could lead to jury confusion and reduction of damages based solely on Jones's receipt of social security disability payments. Bowie also objected to, and the trial court excluded, testimony from Jones attempting to minimize jury speculation that Jones would get a double recovery through receipt of social security if the jury awarded damages.

Because the potential for confusion of the issues was great and the evidence was not

highly probative of malingering, we are convinced that admitting evidence of Jones's receipt of workers' compensation and social security benefits was a clear abuse of discretion.

Even though admission of evidence is erroneous, we will reverse only if the error was not harmless.[32] "A trial court's error in admitting evidence 'is harmless when there is no reasonable likelihood that the admitted evidence had an appreciable effect on [the trier of fact].' "[33] To determine whether an erroneous admission of evidence was harmless, "we do our best to put ourselves in the position of the trier of fact."[34] Among the factors we consider is "the degree of emphasis placed upon the evidence during the trial, both during questioning and in the closing arguments."[35]

After reviewing testimony and the final arguments, we hold that the error in admitting the collateral source evidence was not harmless. Bowie questioned several witnesses and Jones about his receipt of benefits and used his receipt of benefits in closing to suggest that he was not entitled to damages that he claimed. Additionally, the jury's recommendation that future economic damages be held in trust to pay for medical expenses suggests that it was influenced by Bowie's intimation that Jones improperly used his lump sum workers' compensation payment.[36]

### 2. Jones's past drug use

Jones also argues that the trial court erred in permitting Bowie to introduce evi-

**29.** AS 23.30.095(a), (c).

**30.** AS 23.30.095(c); 8 Alaska Administrative Code (AAC) 45.082(e)-(h) (2011).

**31.** *Stone v. Fluid Air Components of Alaska*, 990 P.2d 621, 625 (Alaska 1999).

**32.** *Brandner v. Hudson*, 171 P.3d 83, 87 (Alaska 2007) (citing *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 142 (Alaska 2004)).

**33.** *Id.*

**34.** *Alderman*, 104 P.3d at 142–43 (citing *Dobos v. Ingersoll*, 9 P.3d 1020, 1024 (Alaska 2000)).

**35.** *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 773 (Alaska 1982) (citing *Poulin v. Zartman*,

542 P.2d 251, 261 (Alaska 1975)); *see also Tolan v. ERA Helicopters, Inc.*, 699 P.2d 1265, 1270 (Alaska 1985) (noting that witnesses were "questioned extensively" about litigation agreement and agreement was portrayed as "dishonorable" in closing argument).

**36.** Because Jones did not object during Bowie's closing argument, Bowie argues that Jones waived any claim of error based on its closing. Failure to object to Bowie's closing argument waived Jones's right to claim error on the basis of the argument alone, but, as Bowie conceded at oral argument before us, Bowie's use of the evidence, including its use in closing, can be considered in analyzing whether erroneous admission of the evidence was harmless. *Cf. Tolan*, 699 P.2d at 1270 (examining use of evidence in questioning and closing).

dence of his drug use more than five years before the accident because the evidence was unduly prejudicial and had little probative value about the main issues in the case. Jones claims that Bowie's "premise for the admission of the pre-accident drug use ... was false." He asserts that admission of the evidence was harmful because Bowie used the evidence inappropriately in its closing argument, citing the jury's recommendation that part of Jones's damages be placed in trust as proof of harm. Bowie responds that the trial court acted within its discretion when it admitted the evidence and dismisses as "without merit" Jones's claim that the evidence was improperly argued during closing.

Before trial, both parties filed motions in limine about Jones's past drug use. Jones sought to exclude the drug-related evidence under Alaska Evidence Rule 403. Bowie argued that the court should admit the evidence because it was relevant to damages for lost earnings. Bowie asserted that "[i]t [was] ludicrous to think that anyone would employ a truck driver or equipment operator with a drug and alcohol history." The court decided to exclude evidence related to Jones's drug history.

During the course of trial, Bowie asked the court to admit drug use evidence three times. Two times the court decided that the evidence was more prejudicial than probative. During the testimony of its vocational expert, Dr. Choppa, Bowie again asked the court to permit it to bring in evidence of Jones's past drug use. Bowie claimed that it had been surprised by the testimony of Dr. Richard Parks, Jones's economics expert. In his pretrial written report, Dr. Parks had estimated Jones's earning capacity based on Jones re-

turning to work on the North Slope. Dr. Choppa's pretrial report indicated that he thought Dr. Parks's assumption that Jones would return to work on the North Slope as a truck driver was not reasonable. At trial, Dr. Parks testified that one estimate of Jones's earning capacity was based on Jones returning to work as a fuel truck driver in Anchorage rather than working on the North Slope.[37]

■ In arguing that the court should admit the drug use evidence, Bowie said that driving a fuel truck was a "a higher paying, higher level job" than being a regular truck driver and that Jones's past drug use would prevent him from working as a truck driver. Bowie told the court that the earnings estimate based on driving a fuel truck had not previously been disclosed. In opposition, Jones argued that his highest earnings were during the years that he tested positive for drugs, which suggested that the evidence was not probative of his inability to be employed as a fuel truck driver. To counter the allegation of surprise, Jones noted that Dr. Choppa had written in his report that Jones could drive a truck, even after the injury, and that Dr. Choppa had knowledge of Jones's positive drug tests before he wrote that report. The court found that the evidence was probative and decided to admit it.[38]

Dr. Choppa testified that Jones had been admitted for chemical dependency treatment, that the admitting diagnosis was cocaine abuse, and that Jones would not be able to be a fuel truck driver. In addition, Dr. Choppa testified that Jones had been terminated from a different job for "substance abuse

---

**37.** The amount of estimated damages was the same in both reports. Dr. Parks explained the discrepancy by testifying that he became aware when reviewing Jones's income history that Jones's highest earnings were in years when he drove a fuel truck in Anchorage.

**38.** The court did not articulate why the evidence was more probative than prejudicial, instead discussing surprise to Bowie as a reason for permitting introduction of the evidence. Surprise is not a factor in a Rule 403 analysis. The Commentary to Rule 403 indicates that surprise may be related to unfair prejudice, but also states that

under Rule 403 the court balances "the probative value of and need for the evidence against the harm likely to result *from its admission.*" (Emphasis added.) Jones was the party harmed by admission of the drug-use evidence, not Bowie, so surprise to Bowie should not have been a factor in the court's Rule 403 analysis. If Dr. Parks's testimony surprised Bowie, Bowie could have asked for a continuance or sought to exclude the novel part of his testimony. *See* Alaska R. Evid. 403 Commentary. In sum, surprise does not serve as a reason to admit otherwise prejudicial evidence.

urinalys[e]s that were positive."[39] Dr. Choppa testified that HAZMAT driving required a background check.

On cross-examination, Dr. Choppa conceded that Jones still had a commercial driver's license. He said that Jones could have been a truck driver "earning the kind of money he earned at Great Alaska or Titan." When asked whether it was his opinion that Jones "could have been driving [a] truck if he hadn't been injured for everybody except HAZMAT," Dr. Choppa said:

> No. Any large—any large company that—they all do background checks. My son has a commercial driver's license. Drives for Costco. He has [a] urinalysis every month. It's standard. But—but landscaping companies, they don't—it's not quite as strict, some of the smaller landscaping companies, and you don't make the money that you do in the larger companies.

Our review of the record did not reveal any testimony from Dr. Choppa that a fuel truck driver's pay scale was higher than that of a regular commercial truck driver.

After Dr. Choppa's testimony ended, Jones brought to the court's attention that there were discrepancies between Bowie's proffer and Dr. Choppa's testimony. The court responded by saying, "to the extent you're asking for reconsideration, the court's denying reconsideration." The day after the drug use testimony, the jury sent the court a note asking "to know the exact dates for the urine analysis which · tested positive for drugs." The court mistakenly thought the dates had been discussed in the testimony and did not answer the jury's question.[40]

Jones revisited this issue in his motion for a new trial, arguing again that Bowie's rationale for admission of the evidence was inaccurate. The trial court denied Jones's motion for a new trial, stating that the drug use evidence was admitted "for the purpose of showing that [Jones] would not likely be eligible to drive a fuel truck in Anchorage in the future and make the kind of money that a fuel truck driver in Anchorage would make, not for any other purpose."

In reviewing the trial court's determination, we first look at the relevance of the evidence. Here the trial court permitted Bowie to introduce evidence that it had previously determined was more prejudicial than probative based on Bowie's assertion that it had been unfairly surprised by Jones's damages calculations based on wages as a fuel truck driver. At the time Bowie asked for admission of the evidence, it said that being a fuel truck driver was "a higher paying, higher level job."

The drug use evidence was potentially relevant to Jones's future lost earnings claim, the purpose for which the trial court admitted it.[41] If a fuel truck driver made higher wages than a general truck driver and if driving a fuel truck had different drug or alcohol qualifications than those needed to haul other materials, the evidence of Jones's drug use could have undermined Jones's claim that he could have returned to work as a fuel truck driver in Anchorage.

But Dr. Choppa's testimony did not match Bowie's rationale for admission, which tied the drug use to employment as a fuel truck driver. Dr. Choppa divided low and high wage trucking jobs and, ultimately, Jones's prospects for employment as a truck driver based on the *size* of the company employing him, not on the material being hauled. As a result, the evidence of past drug use was not directly relevant to the point for which it was offered—to rebut Dr. Parks's testimony that Jones could have worked as a fuel truck driver.

As we noted in *Liimatta v. Vest*, "[e]vidence of prior drug use … certainly presents a danger of unfair prejudice" because a jury could decide a case based on its judgment that a party is a bad person rather

---

**39.** It is not clear from the record what tests were positive for or exactly when they happened. Outside of the jury's presence, the attorneys discussed the dates of two positive pre-accident urinalyses, one in September 1996 and one in May 1998.

**40.** Dr. Choppa's testimony noted only the year of one positive pre-accident urinalysis (1998) but not the exact dates of any tests.

**41.** No one contends that the drug use evidence was probative of the central issues of the case, including allocation of fault.

than on the merits of the case.[42] The trial court was cognizant that evidence of past drug use was prejudicial: It excluded the evidence before trial and ruled twice at trial that drug use evidence was more prejudicial than probative. The court's ruling on the motion for a new trial also suggests that it recognized that the evidence could have a prejudicial impact because it said that the evidence was admitted only for a limited purpose. The jury was clearly interested in the drug use testimony: It wrote a note to the court, asking for clarification of the evidence.

In balancing the probative value of the evidence against its danger of unfair prejudice, it was error to fail to strike Dr. Choppa's testimony when Jones brought to the court's attention the discrepancies between the testimony and Bowie's proffer. Dr. Choppa's testimony did not provide evidence to support the claim that Jones could not be a fuel truck driver rather than a general truck driver.

 Admission of the drug use evidence was harmful to Jones. In closing argument, Bowie referred to Jones's drug use several times. Bowie asserts that it "simply argued that the jury should not calculate future wage loss based on the assumption that Mr. Jones was qualified to be employed as a fuel truck driver" because of his drug problems. But besides arguing that the positive urinalyses would prevent Jones from working as a fuel truck driver, Bowie referred to Jones's "long history" of drug use, and it portrayed Jones's lifestyle as including drug use: Though Jones had presented himself as "an average middle class family man," Bowie told the jury, "you know he's living in a vehicle in a parking lot, not working, not paying his child support, using drugs."[43] As we noted

earlier, Bowie also implied in closing that Jones had used his workers' compensation money for drugs. The jury's recommendation that the award of future economic damages be put in trust to pay for future medical expenses suggests that it used the drug use testimony for more than an assessment of Jones's future earning capacity.

### 3. Summary

The admission of both collateral source evidence and drug use evidence here was erroneous and prejudicial. We therefore reverse the judgment and remand for a new trial.[44]

### B. The Trial Court Did Not Err In Refusing To Give A Negligence Per Se Instruction Against Great Alaska Lawn.

Jones argues that the court erred in failing to give a negligence per se instruction against Great Alaska Lawn. Bowie maintains that the court properly declined to give a negligence per se instruction against Great Alaska Lawn because it was not acting as an employer when it lent the hydromulcher to Titan.

Jones asked the trial court to give a negligence per se instruction against Great Alaska Lawn based on the theory that as an employer, it was charged with knowledge of workplace safety regulations[45] and Great Alaska Lawn operated the hydromulcher in violation of the regulations for eight years before it lent the hydromulcher to Titan. The trial court decided that the jury could use OSHA violations as evidence of Great Alaska Lawn's negligence, but it declined to give a negligence per se instruction against Great Alaska Lawn.

---

**42.** 45 P.3d 310, 315 (Alaska 2002).

**43.** Testimony showed that Jones was living in a recreational vehicle in 2002–03, not at the time of his positive pre-accident drug screens in 1998 and earlier.

**44.** Jones also appeals the trial court's denial of his motion for a new trial, arguing that the evidence in support of the jury's verdict was so slight and unconvincing as to warrant a new trial. Because we reverse the judgment and re-

mand for a new trial on another basis, we do not decide this issue.

**45.** We refer to the workplace safety regulations as "OSHA regulations." The Alaska Department of Labor and Workforce Development has adopted many of the regulatory standards of the United States Occupational Safety and Health Administration (OSHA) as the standards for workplace safety in Alaska. *See* 8 AAC 61.1010 (2011).

Violation of a statute or regulation can "amount[ ] to negligence as a matter of law ... when the statute or regulation at issue defines a standard of conduct that a reasonable person is expected to follow under the circumstances presented."[46] We have previously stated that "[w]here there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se...."[47] But if Great Alaska Lawn violated the OSHA regulations, it did so when it was an employer, not when it supplied the equipment to Titan.

Great Alaska Lawn did not have a duty to comply with the OSHA regulation in its role as a supplier of equipment, even if it had a duty to do so when it employed Jones. Jones was thus not entitled to a negligence per se instruction against Great Alaska Lawn even though the hydromulcher did not meet OSHA standards for guarding and had not met them during the time Jones worked for it. The purpose of OSHA and its regulations is to provide employees a safe workplace.[48] In the regulations, "place of employment" is defined as "any place such as, but not limited to, a factory, plant, business, construction site, or other area, workplace or environment where work is performed by an employee of an employer."[49] A supplier of equipment has a duty under the OSHA regulations to provide a safe working environment at its own work site, but it does not have a duty under the OSHA regulations to ensure the safety of another employer's place of employment.

Jones asserts that our holding in *Cable v. Shefchik*[50] required a negligence per se instruction against Great Alaska Lawn, but

*Cable* is distinguishable. In *Cable*, we held that the trial court erred by failing to give a negligence per se instruction against an employer even though the injured plaintiff was not his employee.[51] But in *Cable* the accident happened at the employer's work site, and the employer had allegedly violated regulatory standards of the Alaska General Safety Code meant to ensure a safe workplace for its employees, which we had previously held were generally applicable to construction sites.[52] The violation was the basis for the plaintiff's claim—the defendant's failure to maintain a safe workplace was alleged to be a cause of the plaintiff's injury.[53] If Jones had been injured at a work site operated by Great Alaska Lawn, he might have been entitled to a negligence per se instruction against it. But Jones argued in the trial court that Great Alaska Lawn and Titan were not a partnership or joint venture, so he cannot assert that Great Alaska Lawn had control over Titan's work site. Jones's theory of liability was based on Great Alaska Lawn's supplying the equipment, not its maintenance of an unsafe workplace.

Jones also argued that Great Alaska Lawn was negligent per se in not complying with OSHA regulations during the time it used the equipment. But Jones was not injured during the time Great Alaska Lawn operated the equipment at its own work sites. Because Great Alaska Lawn was not Jones's employer and did not have a duty under the OSHA regulations to provide him with a safe workplace, the trial court properly refused to give a negligence per se instruction against Great Alaska Lawn.

### C. It Was Error To Grant A Directed Verdict To Christianson.

Jones also appeals the directed verdict for Christianson. He advances three

**46.** *Pagenkopf v. Chatham Elec., Inc.,* 165 P.3d 634, 647 (Alaska 2007) (citing *Bachner v. Rich,* 554 P.2d 430, 441–42 (Alaska 1976)).

**47.** *Bachner,* 554 P.2d at 442.

**48.** AS 18.60.010; *see also Indus. Union Dep't, AFL–CIO v. Am. Petroleum Inst.,* 448 U.S. 607, 611, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (noting that purpose of Occupational Safety and Health Act of 1970 was to ensure "safe and healthful working conditions").

**49.** 8 AAC 61.1930 (2011).

**50.** 985 P.2d 474 (Alaska 1999).

**51.** *Id.* at 478–79.

**52.** *Id.* at 477–78.

**53.** *Id.*

alternative arguments for reversing the trial court. First, he contends that the trial court incorrectly found that AS 10.06.678, the statutory section related to winding up corporate affairs, applied to the case. Alternatively, he argues that he presented enough evidence to pierce the corporate veil and hold Christianson personally liable for any tort that Great Alaska Lawn committed. His last argument is that Christianson should be liable for his personal tortious activities, namely providing an unsafe machine to Titan.

Christianson responds that the court correctly concluded that there was inadequate evidence presented to pierce the corporate veil and that Great Alaska Lawn's loan of the hydromulcher to Titan did not violate the winding-up statute, which sharply limits corporate action that may be taken during the winding-up period. He also asserts that Jones waived any argument that Christianson should be liable for his personal tortious activities by failing to raise it in the trial court.

■■■ The standard of review for a directed verdict is "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors." [54] "If there is room for diversity of opinion among reasonable persons, then the question is one for the jury to decide and a directed verdict is not appropriate." [55] Viewing the evidence in the light most favorable to Jones, the evidence and reasonable inferences from it were adequate to present a jury question on both the piercing issue and the winding-up issue. [56]

■■ We have previously held that the question whether a corporate veil can be pierced under the mere instrumentality test involves a consideration of the six factors set out in *Uchitel Co. v. The Telephone Co.:* [57]

> whether (a) the shareholder sought to be charged owns all or most of the stock of the corporation; (b) the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) the corporation has grossly inadequate capital; (d) the shareholder uses the property of the corporation as his own; (e) the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; and (f) the formal legal requirements of the corporation are observed. [58]

A party seeking to pierce the corporate veil does not need to present evidence of all six factors; the factors assist the trial court to determine "whether the evidence favors piercing the veil." [59]

The evidence in this case and inferences from it could satisfy several of the factors. Christianson was the sole shareholder and caused the incorporation of both Great Alaska Lawn and Titan. The state involuntarily dissolved Great Alaska Lawn, indicating that Christianson did not observe all of the formalities of the corporate form. A reasonable factfinder could infer that Christianson did not act independently in the interests of the corporation and effectively used corporate assets as his own because of the "loan" of the hydromulcher to Titan. Christianson did not introduce any loan documents related to the hydromulcher or other equipment he let Titan use at no charge.

**54.** *City of Delta Junction v. Mack Trucks, Inc.,* 670 P.2d 1128 (Alaska 1983) (citing *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 220 (Alaska 1978)).

**55.** *L.D.G., Inc. v. Brown,* 211 P.3d 1110, 1125 (Alaska 2009) (citing *Holiday Inns of Am., Inc. v. Peck,* 520 P.2d 87, 92 n. 12 (Alaska 1974)).

**56.** As to Jones's third basis for challenging the directed verdict, we agree with Christianson that Jones waived his argument that Christianson should be liable for his personal tortious activi-

ties by not raising it in the trial court. Jones did not dispute Christianson's assertion that he failed to raise the issue in the trial court, and our review of the record did not reveal that Jones raised this argument.

**57.** 646 P.2d 229 (Alaska 1982).

**58.** *L.D.G.,* 211 P.3d at 1126 (citing *Uchitel,* 646 P.2d at 235).

**59.** *Id.* (citing *Nerox Power Sys., Inc. v. M–B Contracting Co.,* 54 P.3d 791, 802 (Alaska 2002)).

Jones was also entitled to have the jury decide whether Christianson was in fact winding up corporate affairs, as he claimed. Alaska Statute 10.06.678(a) permits a dissolved corporation to continue its existence only for the purpose of winding up corporate business. If Christianson conducted business as Great Alaska Lawn after its dissolution, he can be held personally liable for his actions.[60] The evidence presented at trial could support the inference that Christianson continued to operate Great Alaska Lawn as a business after its involuntary dissolution. Great Alaska Lawn owned the hydromulcher, which Christianson loaned to Titan.[61] Two vehicles, which Titan used, were registered under Great Alaska Lawn's name after Jones's accident. In addition, Christianson testified that he advertised by using "stickers on our trucks" and that Great Alaska Lawn's phone number was painted on the side of the hydromulcher at the time of the accident.

In sum, sufficient evidence was presented at trial to present a jury question on both theories of Christianson's personal liability.

## V. ISSUES RELATED TO BOWIE'S CROSS–APPEAL

Bowie raises several issues in its cross-appeal. Because we are remanding for a new trial, we address the issues that will likely recur at a second trial.[62]

### A. The Trial Court Did Not Err In Instructing The Jury On A Post–Sale Duty To Warn.

■ Bowie asserts that the trial court erred in instructing the jury on Jones's post-sale duty to warn claim on two alternative grounds: It asks us to hold that it had no post-sale duty to warn or, if we decide that it had such a duty, to find that Jones failed to produce enough evidence to justify instructing the jury on the issue. Jones contends that the trial court's decision is unreviewable. In the alternative, he argues that the court correctly instructed the jury using the Restatement (Third) of Torts: Products Liability section 10 and that he provided adequate evidence to let the jury decide his claim.

■ When a trial court denies summary judgment on factual grounds, the order would ordinarily not be reviewable after a trial on the merits.[63] Here, the trial court denied partial summary judgment without explanation, and the parties disagree about whether the denial was due to material factual disputes. Whether the court's decision was based on facts or was simply a legal ruling is unimportant in this case because we are reversing the trial court's judgment on other grounds and address the issue to provide guidance to the trial court on remand.

■ The parties agree that under Alaska law, the manufacturer of a product that is defective at the time of sale has a duty to warn of dangers in the product. Some courts have also recognized that a manufacturer has a post-sale duty to warn even when the manufacturer became aware of the danger only after the time of sale.[64] A post-sale duty to warn is imposed on a manufacturer in part because it is in a "unique (and superior)

---

**60.** *See Steenblik v. Lichfield,* 906 P.2d 872, 877–79 (Utah 1995) (holding that officers and directors are liable for corporate debts incurred after suspension of corporation and noting that this is the majority rule).

**61.** Christianson testified that ownership of the hydromulcher was transferred to Titan in 2005.

**62.** We do not address Bowie's contention that the court erred in permitting Jones to call a previously unidentified rebuttal expert witness. This issue is moot and will likely not arise on remand. *Parnell v. Peak Oilfield Serv. Co.,* 174 P.3d 757, 769 (Alaska 2007).

**63.** *Larson v. Benediktsson,* 152 P.3d 1159, 1169 (Alaska 2007).

**64.** *See, e.g., Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 861 P.2d 1299, 1313 (1993) (recognizing post-sale duty to warn of potentially life-threatening defects discovered after sale); *Brown v. Crown Equip. Corp.,* 960 A.2d 1188, 1193–94 (Me.2008) (holding that post-sale duty to warn existed at common law in certain circumstances); *Lewis v. Ariens Co.,* 434 Mass. 643, 751 N.E.2d 862, 867 (2001) (adopting Restatement (Third) of Torts: Products Liability § 10 as standard for post-sale duty to warn but holding that there was no duty as a matter of law in the case); *Cover v. Cohen,* 61 N.Y.2d 261, 473 N.Y.S.2d 378, 461 N.E.2d 864, 871 (1984) (setting out factors for court to consider in deciding whether manufacturer has a post-sale duty to warn).

position to follow the use and adaptation of its product by consumers." [65]

The circumstances triggering a post-sale duty to warn are not uniform in these decisions. Some courts have decided that the duty arises only when the danger is potentially life-threatening.[66] Others have found a duty when the defect existed at the time of sale, even if the defect became apparent only after sale.[67] A few courts have imposed a limited duty to inform known users of safety improvements.[68] Recognizing that a duty to warn of any possible post-sale danger could be unduly burdensome, courts have considered the reasonableness of imposing the duty in a given case.[69]

■ We hold that a manufacturer has a post-sale duty to inform consumers of its products of dangers that became apparent after sale when the danger is potentially life-threatening. We adopt the Restatement (Third) of Torts: Products Liability section 10 as the standard to apply in such cases.[70]

Bowie contends that even if it had a post-sale duty to warn, Jones failed to present sufficient evidence for the claim to go to the jury. The Restatement sets out four factors to balance in determining whether a reasonable person in the seller's position would provide a post-sale warning.[71] It contemplates that a court will make an initial determination that some evidence has been introduced to support each factor before instructing a jury on the question.[72] The trial court summarized the evidence that it found justified letting the jury decide the issue. We agree with the trial court that Jones presented enough evidence on each of the factors to let the case go to the jury.[73]

The first factor in the Restatement is that "the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property."[74] Jones presented evidence that Bowie knew the hydromulcher posed a substantial risk of harm. A few years after Bowie first manufactured and distributed its hydromulchers, it became aware that workers were using their feet to force mulch into the opening and were suffering severe injuries as a result. In 1973 Bowie's safety engineer testified in a South Dakota amputation case that there was a "natural inclination" or "natural reaction" for workers to use their feet to unclog the shredder and that the machine should have been designed with this reaction in mind. Bowie's argument that Jones did not present enough evidence of harm rests on the relative infrequency of severe accidents, but infrequent, severe accidents can still cause substantial harm.[75]

---

65. *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303, 307 (1998).

66. *Patton*, 861 P.2d at 1313.

67. *Downing v. Overhead Door Corp.*, 707 P.2d 1027, 1033 (Colo.App.1985).

68. *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915, 923 (1979).

69. *See Lewis*, 751 N.E.2d at 867 n. 18 (summarizing factors considered by courts in reasonableness standards).

70. We do not hold that there is a duty to warn of technological improvements or to recall a defective product. The principal defect that Jones identified in the hydromulcher was lack of guarding. Adequate guarding is not a technological innovation. Jones's mechanical engineering expert testified that the need for guarding of dangerous moving parts was recognized in machine design as early as 1916 and by the 1940s and 1950s government publications showed engineers how to address hazards by means of mechanical guarding. The guarding added after the OSHA inspection consisted of railing around the opening where the mulch was fed. Bowie's hydroseeding industry expert, who was also a Bowie dealer, testified that he welded guarding around the openings on used hydromulchers for safety purposes.

71. RESTATEMENT (THIRD) OF TORTS. PRODUCTS LIABILITY § 10(b) (1998).

72. *Id.* at § 10 cmt. a.

73. We review this issue as we would a motion for a directed verdict, viewing the evidence in the light most favorable to Jones to see whether reasonable jurors could differ in their judgment. *See Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 794 (Alaska 1999) (quoting *Hahn v. Russ*, 611 P.2d 66, 67 (Alaska 1980)).

74. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 10(b)(1).

75. *Id.* cmt. d ("[N]o duty arises after the time of sale to issue warnings regarding product-related

The second factor is that the seller can identify the recipients of the warning and that those recipients can reasonably be assumed to be unaware of the risk.[76] Bowie claims that Jones offered no evidence that Bowie could reasonably identify Titan in order to provide a warning. But the Restatement does not require individual names and addresses of ultimate users.[77] Even so, Jones presented evidence that Bowie could identify some remote purchasers through parts sales because Bowie kept lists of parts customers. Jones also presented evidence, which Bowie contested, that Great Alaska Lawn had in fact contacted Bowie to order parts for the hydromulcher. Bowie produced relatively few hydromulchers like the one that injured Jones, making identification of the class of ultimate users less burdensome. Finally, hydromulchers are specialized machines with a limited population of users, so that advertisements in trade publications were another viable method of contacting or warning remote users of the machines.[78]

The third factor is that "a warning can be effectively communicated to and acted on by those to whom a warning might be provided."[79] Bowie's argument related to communicating the warning focuses on individualized notice. Yet the Restatement does not limit communications to individual notices, specifically mentioning that using public media may be required.[80] Jones presented evidence that Bowie kept a list of parts customers but had not made an effort to send warnings to parts customers who were different from the original purchasers, and that Bowie had not placed a notice in trade publications in which it advertised. Jones showed

that a warning could be acted on through Christianson's testimony that his company had in fact made the recommended changes after the accident.[81]

The fourth factor is that the risk of harm is sufficiently great to justify the burden of providing a warning. Even though accidents like Jones's were infrequent, they were severe. Bowie offered no explanation for why it did not include a warning or information related to guarding with parts orders. Viewing the evidence in the light most favorable to Jones, there was sufficient evidence on each of the factors set out in the Restatement to justify giving the case to the jury.

Bowie also argues that even if Jones proved the elements of a post-sale warning claim, there was nonetheless no duty to warn in this case because any danger was open and obvious. Jones counters that the danger cannot have been open and obvious given the number of similar accidents and the testimony of Jones and his coworkers about their training and experiences. Jones contends that workers using their feet to push mulch into the opening was reasonably foreseeable. Indeed, Jones presented evidence that workers were unaware of the risk of harm. He introduced evidence of similar accidents and presented testimony from his coworkers that before his accident, they were unaware that the hydromulcher could cause such severe injuries. Jones and his coworkers testified that it was not uncommon to use their feet to push on mulch bales that did not feed properly, although their descriptions of how they used their feet differed. He testified that he had seen another worker's foot contact the

---

accidents that occur infrequently *and* are not likely to cause substantial harm." (emphasis added)).

**76.** Restatement (Third) of Torts: Products Liability § 10(b)(2).

**77.** *Id.* cmt. e ("Individual names and addresses are not necessarily required. Records may indicate classes of product users, or geographically limited markets.").

**78.** *Cf. Kozlowski v. John E. Smith's Sons Co.,* 87 Wis.2d 882, 275 N.W.2d 915, 923 (1979) (noting that sausage stuffer's limited market was a factor in considering whether manufacturer had a continuing duty to warn).

**79.** Restatement (Third) of Torts. Products Liability § 10(b)(3).

**80.** *Id.* cmt. g ("When direct communication is not feasible, it may be necessary to utilize the public media to disseminate information regarding risks of substantial harm.").

**81.** Bowie claims that Titan's and Great Alaska Lawn's failure to make the hydromulcher OSHA compliant shows that a warning would probably have been futile. But Jones only needed to provide evidence that a warning *could* be acted upon, not that it *would* be acted upon.

shredder bar with no ill effects and that his foot had bounced off the shredder bar on prior occasions. And, as Bowie's biomechanics expert testified, a bale of mulch would obscure the shredder bar from a worker who was pressing down on the bale with his foot. Jones also presented the testimony of Bowie's former safety engineer agreeing that it was a "natural reaction" or a "natural inclination" of a worker to use his foot to press on mulch to unclog the machine.

We have previously held that a manufacturer has "no duty to warn of hazards or dangers that would be readily recognized by the ordinary user of the product." [82] Viewing the evidence in the light most favorable to Jones, we conclude that the question whether the danger presented by the shredder bar would be readily recognized by an ordinary user of the hydromulcher is a question of fact that was properly left to the jury.

■ Finally, Bowie asserts that applying a post-sale duty to warn to it in this case would violate its due process rights because it would be fundamentally unfair. Bowie waived this argument by not raising it in the trial court.[83] We have previously held that "[a]bsent special circumstances, a new decision of this court will be given effect in the case immediately before the court." [84] Bowie waived any argument that this decision should not apply to it based on equitable factors because it raised that issue for the first time in its reply brief.[85]

### B. The Trial Court Did Not Err In Refusing To Dismiss Jones's Negligence Claims Based On The Statute Of Repose.

■ Bowie argues that the trial court erred in denying its motion to dismiss Jones's negligence claims based on the statute of repose. Bowie contends here, as it did in the trial court, that only Jones's strict products liability claim falls within the "defective product" exception to the statute of repose and that his two negligence claims have been extinguished by the ten-year limit on personal injury actions. Jones responds that Bowie raised the statute of repose too late and that the trial court correctly construed the "defective products" exception to include negligence actions as well as strict products liability actions.

Interpretation of a statute is a question of law to which we apply our independent judgment; we interpret the statute "according to reason, practicality, and common sense," considering the meaning of the statute's language, its legislative history, and its purpose.[86]

Alaska Statute 09.10.055 provides in pertinent part:

(a) ... [A] person may not bring an action for personal injury, death, or property damage unless commenced within 10 years of the earlier of the date of

. . . .

(2) the last act alleged to have caused the personal injury, death, or property damage.

(b) This section does not apply if

(1) the personal injury, death, or property damage resulted from

. . . .

(E) a defective product; in this subparagraph, "product" means an object that has intrinsic value, is capable of delivery as an assembled whole or as a component part, and is introduced into trade or commerce....

Bowie argues that "defective product" as used in the statute of repose is a "term of art

---

**82.** *Prince v. Parachutes, Inc.*, 685 P.2d 83, 88 (Alaska 1984) (citing *Patricia R. v. Sullivan*, 631 P.2d 91, 102 (Alaska 1981)).

**83.** *See Gunter v. Kathy-O-Estates*, 87 P.3d 65, 69 n. 10 (Alaska 2004) (citing *Reid v. Williams*, 964 P.2d 453, 456 (Alaska 1998)) (declining to address argument not raised below).

**84.** *Plumley v. Hale*, 594 P.2d 497, 502 (Alaska 1979).

**85.** *Rausch v. Devine*, 80 P.3d 733, 740 n. 32 (Alaska 2003) (citing *Childs v. Tulin*, 799 P.2d 1338, 1340 n. 5 (Alaska 1990)).

**86.** *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

describing a particular legal theory," namely strict products liability. Bowie maintains that because courts have recognized separate causes of action for negligence and strict products liability, the legislature intended "defective product" to exempt only strict products liability actions from the statute of repose.

■ The language of the statute does not support Bowie's interpretation. "In assessing statutory language, 'unless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage.'"[87] Here, the legislature defined "product," and this definition refers to the tangible thing that causes an injury, not to the legal theory that a plaintiff might use to recover for the injury.[88] What qualifies as a product may "establish[ ] the boundaries of the subject matter affected by strict products liability in tort."[89] But the common law recognizes that persons injured by a defective product can bring suits in negligence as well as strict products liability, just as Jones did here.[90] Bowie points to no cases establishing that the phrase "defective product" has the established meaning of "strict products liability" at common law.[91] The Restatement (Third) of Torts: Products Liability refers to "strict products liability," not "defective product," as a "term of art that reflects the judgment that products liability is a discrete area of tort law which borrows from both negligence and warranty."[92]

The legislative history also fails to provide evidence that the legislature meant the "defective product" exception to be limited to strict products liability causes of action. Representative Brian Porter, a sponsor of the legislation, commented that the defective product exception was "one of the biggest exceptions" to the statute of repose and cited Thalidomide as an example of a defective product; his comments do not reflect any intent to exclude negligence actions from the defective product exception.[93]

Because AS 09.10.055(b)(1)(E) contains an express exception to the statute of repose for injuries resulting from defective products and does not distinguish between different theories of recovery for those injuries, we hold that the statute of repose did not extinguish Jones's causes of action against Bowie for negligence.

### C. The Trial Court Did Not Err In Instructing The Jury On Punitive Damages.

Bowie contends that the trial court erred in permitting the jury to decide whether to impose punitive damages, arguing first that Jones failed to establish that Bowie's conduct had an impact on Alaska or its residents and implying that a punitive damages instruction violated its constitutional right to due process.[94] It argues in the alternative that there was insufficient evidence of conduct that Bowie acted with actual malice or reckless indifference to instruct the jury on punitive damages. Jones responds that Bowie waived its constitutional argument and that

**87.** *Muller v. BP Exploration (Alaska), Inc.*, 923 P.2d 783, 788 (Alaska 1996) (quoting *Tesoro Alaska Petroleum Co. v. State*, 746 P.2d 896, 905 (Alaska 1987)).

**88.** AS 09.10.055(b)(1)(E).

**89.** RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 19 reporter's note cmt. a. (1998).

**90.** *See* 2 DAN B. DOBBS, THE LAW OF TORTS § 357 (2001); W. PAGE KEETON ET AL, PROSSER & KEETON ON THE LAW OF TORTS § 99 (5th ed.1984); *see also Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 818 A.2d 769, 773–74 (2003) (noting that legislature defined product liability claim to include all claims caused by defective products).

**91.** *See Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (holding

that where there is no definition in a statute, a word in the statute is construed to have its common law meaning).

**92.** RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 1 cmt. a.

**93.** Minutes, H. Jud. Comm. Hearing on S.S.H.B. 58, 20th Leg. 1st Sess., Tape No. 97–23, Side A at 0846–1050, (Feb. 21, 1997) (Statement of Rep. Brian Porter, sponsor).

**94.** Bowie does not explicitly argue that the instruction on punitive damages violated its due process rights, but this argument is implied by the cases Bowie cites.

the trial court acted within its discretion when it instructed the jury on punitive damages. The trial court instructed the jury on punitive damages related to Jones's post-sale failure to warn claim, finding that he had presented enough evidence to meet the threshold for punitive damages only on this claim.

■ We agree with Jones that Bowie waived its argument that a punitive damages instruction violated its due process rights.[95] Bowie's constitutional argument to the trial court was substantially different from its constitutional argument here. In the trial court, Bowie argued that the court lacked jurisdiction to impose punitive damages because Texas, the state where Bowie's principal place of business is located, had rejected a post-sale duty to warn. Here, in contrast, Bowie argues that imposition of punitive damages would violate its due process rights because Jones did not present evidence that Bowie's failure to warn hydromulcher owners of possible dangers had any impact on Alaskans. Although Bowie relies on the same cases to make this argument, a jurisdictional argument based on Texas law is substantially different from an argument about the impact of Bowie's actions on Alaska residents.[96]

Even if we were to consider Bowie's argument, Jones presented evidence that Bowie's failure to take additional steps to warn users of the risks associated with the unguarded opening had an impact on Jones, who lived in Alaska at the time of the accident. The cases Bowie relies on may prohibit an Alaska court from punishing Bowie for any impact its actions had on residents of other states, but nothing in those cases prohibits imposi-

tion of punitive damages for harm caused to Alaskans, including Jones.[97]

■ We also reject Bowie's state law argument. At the end of Jones's case-in-chief, Bowie moved for a directed verdict on the punitive damages claim, alleging that Jones had not introduced enough evidence of recklessness; the trial court denied its motion. We review a decision to submit a punitive damages instruction to the jury for an abuse of discretion; because we are reviewing the denial of a motion for a directed verdict, we consider the evidence in the light most favorable to Jones.[98]

■ To receive an award of punitive damages, a plaintiff must prove "by clear and convincing evidence that the defendant's conduct (1) was outrageous, including acts done with malice or bad motives; or (2) evidenced reckless indifference to the interest of another person."[99] Jones stated at trial that he was not alleging Bowie acted with malice, so we must consider whether there was sufficient evidence that Bowie was recklessly indifferent to Jones's interests.

Viewing the evidence in the light most favorable to Jones, we hold that he produced sufficient evidence of reckless indifference to give the case to the jury. As we noted in *Lamb v. Anderson*,[100] we have adopted the Restatement view of reckless disregard, which "view[s] recklessness as unreasonably disregarding a known risk of substantial physical harm to another."[101] Jones presented evidence that Bowie was aware of amputations caused by its hydromulchers shortly after it began to market them, many

**95.** See Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell, 215 P.3d 1064, 1083 (Alaska 2009) (citing Still v. Cunningham, 94 P.3d 1104, 1111 (Alaska 2004)) (holding that failure to raise specific arguments in superior court waived them).

**96.** Cf. Still, 94 P.3d at 1111 (holding that defendant waived arguments related to mistake and misrepresentation because he did not raise them in superior court, even though his affidavit could have supported the arguments).

**97.** State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 422, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("'[E]ach State alone can determine

what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.'"); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 569, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**98.** Pederson v. Barnes, 139 P.3d 552, 562 (Alaska 2006) (citing Wal–Mart, Inc. v. Stewart, 990 P.2d 626, 632, 637 (Alaska 1999)).

**99.** AS 09.17.020(b).

**100.** 147 P.3d 736 (Alaska 2006).

**101.** Id. at 744–45.

years before the accident here.[102] He showed that Bowie had added a railing around the opening in 1968 and that the railing was inexpensive to install. But in spite of this knowledge and the low cost of adding a railing, Bowie sent out a warning about possible dangers only once—at about the same time it was found liable in another amputation lawsuit. Bowie offered no explanation for its failure to take additional steps to warn users of the dangers of using their feet to press on mulch or to suggest to users that they install guarding around the opening, even though it was aware that amputations were still happening. As the trial court noted, Bowie was "remarkably uninvolved" in trying to identify and contact users of its older machines. Although the jury did not award punitive damages to Jones, the trial court did not err in instructing the jury on punitive damages.

## VI. CONCLUSION

Because we conclude that the trial court improperly admitted prejudicial evidence and the error was not harmless, we REVERSE the judgment of the trial court and REMAND for a new trial against Bowie and Great Alaska Lawn. We REVERSE the trial court's directed verdict for Christianson and REMAND for retrial. We uphold the trial court's decisions to instruct the jury on punitive damages and Jones's negligent failure to warn claim. We AFFIRM the trial court's decision not to give a negligence per se instruction against Great Alaska Lawn and its decision that the statute of repose did not extinguish Jones's negligence claims.

CHRISTEN and STOWERS, Justices, not participating.

---

102. In contrast, we previously held that there was insufficient evidence of outrageous conduct when a manufacturer had received reports of similar injuries close to the time of the accident that was the subject of the lawsuit. *Ross Labs. v. Thies*, 725 P.2d 1076, 1082 (Alaska 1986).